1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

REFLEX MEDIA, INC., et al.,                  Case No.  20-cv-06393-JD

8

Plaintiffs,

9

v.                                                    **ORDER RE MOTIONS TO EXCLUDE OPINIONS OF HAL PORET AND BRIAN SOWERS**

10

SUCCESSFULMATCH.COM, et al.,

11

Defendants.

12

13        In this trademark dispute, defendants SuccessfulMatch.com and Successful Match Canada

14    (both, Successful Match) seek to cancel on genericness grounds the registration of trademarks

15    asserted by plaintiffs Clover8 Investments and Reflex Media, Inc. (both, RMI).  *See* Dkt. Nos. 33,

16    65.  As Successful Match puts it, the trademarks in question "are used in connection with seeking

17    a companion in the 'Sugar Daddy' and 'Sugar Baby' relationship space, online or through an App,

18    which are designed for individuals seeking a specific type of arrangement typically between a

19    young woman and a wealthy man who is often a millionaire."  Dkt. No. 33 ¶ 9.

20        Each side retained an expert witness -- Hal Poret for Successful Match and Brian Sowers

21    for RMI -- to conduct a consumer survey meant to determine whether the disputed marks are

22    generic or not.  Each side then attacked the other expert's survey work as junk science that ought

23    to be excluded from use in this case under Federal Rule of Evidence 702 and *Daubert*.  *See* Dkt.

24    Nos. 86, 119.

25        The Court convened a concurrent expert evidentiary proceeding to hear directly from Poret

26    and Sowers about why they disagreed and why the other's survey work might be so deficient as to

27    warrant exclusion.  *See* Dkt. Nos. 184, 191.  The Court has held concurrent proceedings in several

28    other cases to great effect in resolving FRE 702 challenges.  An essential element of the

proceeding is that the experts mutually agree on what their main areas of dispute are in descending order of magnitude and importance.  Dkt. No. 184 at 1.  Poret and Sowers agreed that the top objections were whether (1) the scope of the "universe" of the relevant purchasing public each expert surveyed was appropriate; (2) it was appropriate to use examples tailored to the sugar-dating market in the survey's "mini-test"; (3) the definitions for "brand" and "generic" used in the surveys were appropriate; and (4) the control terminology for "generic" names used in the surveys were appropriate.  Dkt. No. 185-1 at 1-2.  The experts were invited to exchange their views about what might be the fatal flaws in their colleague's work.  Dkt. No. 192 at 6:1-24.

The parties' familiarity with the record is assumed.  Overall, the testimony during the concurrent proceeding established that the opinions of each expert were based on reliable principles and methods, which each expert reliably applied.  The differences in Poret's and Sowers' approaches and opinions, particularly with respect to defining the proper survey universe, go to issues of weight appropriate for cross-examination at trial.  Consequently, the motions to exclude are denied.

## DISCUSSION

### I.    LEGAL STANDARDS

Amended in December 2023, Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that," *inter alia*, "the testimony is the product of reliable principles and methods" and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."[1]  As the Advisory Committee notes to the 2023 amendment state, the changes were intended "to clarify and emphasize" the plain language of FRE 702 and not radically reinterpret it.  Fed. R. Ev. 702, advisory committee's note to 2023 amendment.  A comparison of the Advisory Committee notes for FRE 702 in 2000 and 2023 readily demonstrates that the recent amendment is

---

[1] This is in addition to arguably the most important requirement of Rule 702, namely that the proposed expert testimony be relevant to the case and so "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Ev. 702(a).

United States District Court
Northern District of California

not intended to be a "seachange" in the performance of the Court's "gatekeeper" function with respect to the admissibility of expert opinions. *Compare* Fed. R. Ev. 702, advisory committee's note to 2000 amendment ("The amendment affirms the trial court's role as gatekeeper . . . . and 'trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system'" (quotation omitted)); *with id.*, advisory committee's note to 2023 amendment ("Nothing in the amendment imposes any new, specific procedures. . . . Similarly, nothing in the amendment requires the court to nitpick an expert's opinion[.]"). Consequently, cases interpreting FRE 702 that predate the 2023 amendments remain fully applicable.

"The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions." *Koger v. Costco Wholesale Corp.*, No. 20-cv-08759-JD, 2023 WL 8188842 at *1 (N.D. Cal. Nov. 27, 2023). "The test of reliability is flexible," *In re Google Play Store Antitrust Litig.*, 20-cv-05761-JD, 2023 WL 5532128 at *5 (N.D. Cal. Aug. 28, 2023) (quotation omitted), and the Court "looks at 'whether the reasoning and methodology underlying the testimony is scientifically valid' and 'whether that reasoning or methodology properly can be applied to the facts in issue,'" *Koger*, 2023 WL 8188842 at *1 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).

For consumer surveys, the Ninth Circuit has "long held" that such evidence "should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'" *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1275 (9th Cir. 2024) (alterations in original) (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010)). "[F]ollow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Id.* (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)).

## II.    THE PROPER SURVEY UNIVERSE

"The first step in designing a survey is to determine the 'universe' to be studied," with "universe" meaning "that segment of the population whose perceptions and state of mind are relevant to the issues in [the] case." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION

§ 32:159 (5th ed.) (McCarthy).[2]  Both parties charge the other side with surveying either a vastly over-inclusive or under-inclusive universe of persons, thereby skewing the results one way or another.  *See* Dkt. Nos. 86 at 12-13; 119 at 7; 192 at 32-41.

At first blush, questions about the proper survey universe might appear to be exclusively a matter for the Court to decide under FRE 702 and *Daubert*.  But as a general rule, disputes about a survey's universe of relevant persons go to its probative value and weight, and so are not typically a basis for exclusion.  *See, e.g.*, McCarthy § 32:162 (collecting cases and concluding that "[i]n most cases, the selection of an inappropriate universe will lessen the weight of the resulting survey data, not result in its [in]admissibility"); *Billfloat Inc.*, 105 F.4th at 1276; *cf. Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).  Consequently, unless a survey universe is so outlandish as to be patently useless, disputes over the scope of the universe meant to represent the relevant purchasing public will go to the trier of fact, subject to cross-examination.

The parties do not disagree that the genericness inquiry looks to whether the consuming public "use[s] or understand[s] the term sought to be protected" as a generic name for the "services set forth in the certificate of registration."  *In re Cordua Rests., Inc.*, 823 F.3d 594, 599, 602 (Fed. Cir. 2016) (quotations omitted).  Rather, the dispute is about how to define the consuming public and populate the relevant survey universe, namely whether the proper universe is comprised of consumers of online dating or matchmaking services generally, which would match the description of the services designated in RMI's registrations,[3] or just consumers of "luxury" dating or "sugar dating" services.  *See* Dkt. Nos. 86 at 12-13; 119 at 7; 192 at 32-41; *see also* Dkt. No. 65 at 1 (describing "sugar dating").  The Lanham Act, Pub. L. No. 79-489, 60 Stat. 427 (1946) (codified at 15 U.S.C. § 1051 *et seq.*), which is the basis of the trademark claims in the

---

[2] Although by no means binding, McCarthy's treatise on trademark law is a persuasive work frequently and favorably cited by the Supreme Court of the United States and other federal courts. *See, e.g.*, *U.S. Patent and Trademark Office v. Booking.com B.V.*, 591 U.S. 549 (2020); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985); *BillFloat Inc.*, 105 F.4th at 1275-76.
[3] *See, e.g.*, Dkt. No. 1-1 at ECF 2 (describing services for the "Seeking Arrangement" mark as "Matchmaking services; social introduction agencies; computer dating services"); 1-5 (describing services for the "Seeking" mark as including "Computer dating services; Dating services, namely, providing an on-line computer database featuring single people interested in meeting other single people; internet-based social networking, introduction, and dating services").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    complaint and the cancellation counterclaims, does not define the "relevant public" for

2    genericness purposes.  *See* 15 U.S.C. § 1064(3).  Neither Successful Match nor RMI presented any

3    governing precedent on this question.

4         A survey of decisions by other federal courts makes clear that the answer typically depends

5    on the facts of the particular case.  *See, e.g.*, *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d

6    397, 400-01, 405-06 (6th Cir. 2002) (looking at manufacturers, customers, suppliers, and vendors

7    in the semiconductor industry as the relevant public where the registration was for "electrical

8    power circuits in combination with electrical logic circuits and parts thereof"); *Interprofession du*

9    *Gruyere v. U.S. Dairy Export Council*, 61 F.4th 407, 413, 416 (4th Cir. 2023) (noting that "the

10   relevant public consists of members of the general public who purchase or consume cheese" where

11   the registration was for cheeses that originated from a region in Switzerland); *Colt Defense LLC v.*

12   *Bushmaster Firearms, Inc.*, 486 F.3d 701, 706-07 (1st Cir. 2007) (looking at competing

13   manufacturers, media publications discussing "carbines," and "purchasers of carbines" as

14   informative of the views of relevant public where the registration was for rifles more generally).[4]

15        The task here is somewhat more complicated because the parties do not agree about the

16   nature of the services offered in connection with the marks.  Successful Match says RMI

17   "expanded the scope of [their] services to include a more general universe of consumers" by

18   "mov[ing] away from the sugar daddy dating space . . . and shift[ing] the focus to connecting

19   people in more typical relationships."  Dkt. No. 138 at 6.  RMI says that they offer a "*luxury*

20   dating service" and nothing suggests they offer "a mainstream or traditional dating site."  Dkt. No.

21   86 at 14 (emphasis in original).  In light of this dispute, the Court cannot conclude that either

22   survey's universe is comprised of respondents whose views would be irrelevant to the bottom-line

23   question of whether the disputed mark, "taken as a whole, signifies to consumers the class of

24   online [matchmaking or dating] services."  *U.S. Patent and Trademark Office v. Booking.com*

25   *B.V.*, 591 U.S. 549, 557 (2020); *see also* MCCARTHY § 32:162.  As a result, the Court cannot

26

27   [4] The First Circuit did not directly address the goods identified in the registration, but the
     plaintiff's asserted "M4" trademark was registered for "Firearms, namely rifles and spare parts and

28   replacement parts for rifles."  *Colt Defense LLC v. Bushmaster Firearms Inc.*, No. 2:04-cv-00240-
     GZS, Dkt. No. 1-2 at 12.

conclude that either expert, in choosing his respective survey universe, failed to reliably apply well-accepted principles in the field.

Consequently, the parties' complaints about the other's chosen universe are best addressed to the trier of fact, not the Court in a motion under FRE 702. *See, e.g.*, *Billfloat Inc.*, 105 F.4th at 1276; *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123-24 (4th Cir. 2011); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844-45, 845 n.24 (11th Cir. 1983); *see also Vision Sports, Inc.*, 888 F.2d at 615 (finding relevant, but of lesser probative value, a survey of "individuals 10 to 18 years old who were participating in or viewing skateboarding or BMX bicycling exhibitions at designated locations, or who had, within the previous year, read specific magazines" in a suit over a mark used in connection with skateboarding-adjacent apparel).

## III.    THE SURVEYS' MINI-TESTS

Poret and Sowers each conducted a "Teflon survey," which is a type of consumer survey that is "essentially a mini-course in the generic versus trademark distinction, followed by a test" wherein the survey-taker is asked to categorize various names or phrases as a "brand" name or term or "generic" name or term. MCCARTHY § 12:16. Teflon surveys typically include a "mini-test" before the main test to ensure that the respondent properly understands and can apply the "brand"/"generic" distinction. The parties' launch various attacks on the other's expert's mini-test, but none of the challenges demonstrate that either survey should be excluded.

### A.    SOWERS' MINI-TEST QUESTIONS

Poret criticized Sowers' questions in the mini-test, which asked respondents to categorize as "brand" or "generic" the terms "Networking Website" and "Sugardaddie." Dkt. No. 119-2 at ECF 43-44; Dkt. No. 192 at 47. Poret believes these questions biased the survey results because they would lead to the exclusion of respondents who categorized "Sugardaddie" as generic, and so artificially tilt the results toward those most likely to say that RMI's asserted marks are a brand. Dkt. Nos. 192 at 47-58; 119 at 7-8.

"In designing a TEFLON-type survey, both the initial 'mini-test' and the other marks and generic names in the list must be carefully constructed and tailored to the facts of a particular case." MCCARTHY § 12:16. At the concurrent evidentiary proceeding, Sowers stated that he

United States District Court
Northern District of California

1  tailored to the case by requiring respondents to apply the "brand"/"generic" distinction to

2  "Networking Services" and "Sugardaddie," the latter of which being a mark he thought was "a

3  pretty prominent player in the marketplace" after conducting research on the sugar-dating space.

4  Dkt. No. 192 at 57-60.

5       The thrust of Poret's critique is that the term Sowers chose to "tailor" his mini-test is "as

6  debatable as what the survey is about in the first place." Dkt. No. 192 at 47. The shortfall of this

7  criticism is that an objection to the specific words Sowers used in the mini-test goes to "follow-on

8  issues of . . . survey design" and not the threshold question about whether the survey was

9  "conducted according to accepted principles." *BillFloat Inc.*, 105 F.4th at 1275-76 (quotation

10 omitted). Indeed, at the evidentiary proceeding Poret stated that "it's not the mere fact of

11 including something in the mini-test that relates to the category that is the fatal flaw. . . . It's the

12 specifics of [Sugardaddie]." *Id.* at 56. The Ninth Circuit has characterized "leading" or "slanted"

13 questions as "technical inadequacies" that "bear on the weight of the evidence, not its

14 admissibility," and so the Court concludes that this specific objection to the word Sowers used in

15 the mini-test most closely resembles those sorts of challenges. *Fortune Dynamic, Inc.*, 618 F.3d at

16 1036 (collecting cases); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir.

17 1997); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292-93 (9th Cir. 1992).

18 Consequently, Sowers' mini-test is not a ground for exclusion.

19      **B.**     **PORET'S COMMON TERM AND TEST EXAMPLES**

20      For his part, Sowers said the "fatal flaw" in Poret's survey was that its wording caused

21 respondents to misunderstand the "brand"/"generic" distinction, which is said to render the survey

22 irrelevant. *See* Dkt. No. 192 at 7-10. Sowers specifically took issue with the prompt at the start of

23 the main test, which told respondents they would need to "answer whether you think that term is

24 . . . a ***common*** term that identifies a type of <u>dating, matchmaking, and social introduction</u> mobile

25 app or website." Dkt. Nos. 86-1 at ECF 90 (emphases in original). In Sowers' view, the

26 definition of a "common term" as a "type" of a dating or matchmaking service would cause

27 respondents to be confused about what a "common" term is as a concept. *See* Dkt. No. 192 at 9.

28

United States District Court
Northern District of California

1    The point is not well taken.  Prior to the language to which Sowers objects, respondents

2    were told that "common terms" are "terms that identify a type of product or service.  Common

3    terms primarily let the consumer know <u>what</u> the product or service is, not who makes it.  For

4    example, AUTOMOBILES, HOME IMPROVEMENT, SOCIAL MEDIA, and WIRELESS are all

5    <u>common</u> terms.  These terms primarily identify a <u>type</u> of product or service."  Dkt. No. 86-1 at

6    ECF 74 (emphases in original).  Sowers acknowledged he had no problems with that initial

7    definition, Dkt. No. 192 at 8-9, so his objection appears to be directed at the shift from "identify a

8    type of product or service" to "identify a type of [word or phrase for the specific product or service

9    at issue]."  This is a minor variation of no apparent import, particularly because respondents were

10   required to read a prior, fuller definition and had to correctly apply the earlier definition before

11   going on to the main test.  *See* Dkt. No. 86-1 at ECF 75-76.  Consequently, Sowers has not

12   established that a respondent would be so confused by the slight variation as to warrant exclusion

13   of Poret's opinions.

14   Sowers also did not present any evidence of actual confusion among respondents.  Poret

15   maintained that several of the main test's questions were designed to control for potential

16   confusion and that the overall results demonstrated that respondents properly identified brands

17   versus generics.  *See* Dkt. Nos. 192 at 14-18; 93-2 at ECF 37-38.  Sowers suggested that the

18   discrepancy between respondents who identified "relationship" as a common term (96%) and

19   "luxury dating service" as a common term (76%) was evidence of confusion.  Dkt. No. 192 at 17.

20   But well more than 50% percent of respondents agreed that "luxury dating service" was common,

21   and a 20% variation in responses is not significant when there is more than majority concurrence.

22   *Cf.* MCCARTHY § 12:16 (describing acceptable range of answers in the original Teflon survey

23   where 51% of respondents thought Thermos was a brand, 68% for Teflon, and 75% for Coke).

24   Sowers also said that the terms Poret used as "common" controls confused respondents

25   about the proper meaning of "generic" or "common."  *Cf.* Dkt. No. 86 at 9-11.  Sowers stated, "If I

26   said, for example, 'I recently signed up for a love' or 'What's your favorite brand of relationship,'

27   you would likely have no idea what I was talking about, and that's because those are not generic

28   terms for the goods and services[.]"  Dkt. No. 192 at 20; *see id.* at 18-22, 28-30.  At bottom, the

United States District Court
Northern District of California

1    critique is that Poret did not include the word "site" or "app" after "love" or "relationship."  *See*

2    Dkt. No. 192 at 30.

3         This too is not persuasive.  Survey respondents were instructed that a common term "let's

4    the consumer know <u>what</u> the product or service is" and that it "identifies a type of <u>dating,</u>

5    <u>matchmaking, and social introduction</u> mobile app or website."  Dkt. No. 86-1 at ECF 74-76

6    (emphases in original).  For each question in the main test, the term in question was capitalized at

7    the top, and right below it the question read: "In the context of <u>dating, matchmaking, and social</u>

8    <u>introduction</u> mobile apps or websites, do you think this is a . . . [(a)] Brand term [(b)] Common

9    term [(c)] Don't know."  *Id.* at ECF 78-79 (emphasis in original).  Sowers did not show that the

10   omission of the word "app" or "site" caused respondents to ignore or become confused about the

11   prior definitions.  Consequently, it is entirely speculative to say that a respondent considering the

12   word "relationship" would not have understood that they were being asked whether "relationship"

13   referred to a brand or type of dating app (e.g., an app for persons looking for relationships as

14   colloquially understood versus other arrangements) or "singles" was a brand or type of social

15   introduction app for single individuals.  That is not a basis of exclusion.  *See Fortune Dynamic,*

16   *Inc.*, 618 F.3d at 1036.

17   **IV.    OTHER CHALLENGES**

18        Each side offered a grab bag of other comments that also do not support exclusion.  RMI

19   objects to the survey's use of the phrases "brand term" and "common term" instead of "brand

20   name" and "common name."  Dkt. No. 86 at 3-8.  This exalts form over substance.  Although

21   "term" and "name" may have somewhat different dictionary meanings, RMI adduced no evidence

22   that respondents using everyday English would have appreciated that subtle difference.  In

23   addition, a plethora of federal-court decisions use "term" in the context of genericness, which

24   demonstrates that the two words are functionally interchangeable for present purposes.  *See, e.g.*,

25   *Booking.com*, 591 U.S. at 554 ("Indeed, generic terms are ordinarily ineligible for protection[.]");

26   *In re Cordua Restaurants, Inc.*, 823 F.3d at 599; *Interprofession du Gruyere*, 61 F.4th at 414.

27        Poret's reasons for selecting his common controls do not demonstrate the survey's

28   irrelevancy, as RMI suggests.  *See* Dkt. No. 86 at 9-10.  As discussed, there is no shortfall that

9

bears on admissibility in Poret's survey's definitions, the failure to include trailing words like "site" or "app" do not provide a basis for excluding the survey, and so RMI's reliance on one or two isolated statements in Poret's report proves too much in the contexts of the report and the concurrent proceeding.

Lastly, Successful Match's suggestion that Sowers' survey is irrelevant because it tests secondary meaning rather than genericness does not carry the day. *See* Dkt. No. 119 at 10; 192 at 46. Sowers' focus on consumers of "sugar dating" services does not warrant exclusion on this record, and the qualification rate alone does not establish irrelevancy. Because Successful Match does not contend that Sowers's mini-test was actually testing secondary meaning rather than genericness and so should not have been included for that reason, the Court need not address the argument.

## CONCLUSION

RMI's motion to exclude the opinions of Hal Poret and Successful Match's motion to exclude the opinions of Brian Sowers are denied.

**IT IS SO ORDERED.**

Dated: November 26, 2024

_____

JAMES DONATO
United States District Judge